Good morning, Your Honors. May it please the Court, Douglas Ames v. Plaintiff-Appellant Michael Sato. I'd like to reserve five minutes for rebuttal. Okay, I'll try and help you. Thank you, Your Honor. The issue in this case is whether the appellee defendant, Orange County Dept. of Education, should continue to enjoy Eleventh Amendment immunity in view of California legislation known as Assembly Bill 97, enacted in 2013. AB 97 constitutes a fundamental decentralization in California's educational system from concentrated state control to local control over the finances and provision of education by local county boards of education. Mr. Ames, I understand the argument with regard to some of the delegation of control issues, but as I understand it from my reading of your briefs and looking at the law, the bill itself didn't change the fact that the state still sets a maximum amount to be spent on students and then provides the difference between what the local school districts are able to raise through local property taxes. So the state still provides most of the funds, does it not? The state, in the case of Orange County Dept. of Education, in the one year that I have the actual statistics for, provided a little less than 50 percent under the new local control financing formula. But you didn't answer his question, because his question is pretty important, which is, under the old statute, as it was before 97, it didn't matter how much the county got to run the school. Otherwise, the state had a max they had to have, and they subtracted out whatever the locals gave them, and they paid the rest. And therefore, they were responsible for the funding. Whatever they got from someplace else, yeah, they got, but it didn't matter. The state provided excess if it didn't equal what they had to get. And Judge Tallman asked you the great question, and in his amicable way, he asked it very fairly. He said, how did that change? That still happens. It doesn't matter how much Orange County gets or, frankly, the Orange County Dept. of Education gets. They make up any difference from what they say they have to have. That's not correct, Your Honor. Well, that's the way. Tell me where I find that in the briefing or where I find that in the statute. Well, where you find that in the statute, well, my entire briefs are directed towards analyzing the statutes with respect to where the revenue is coming from. But think about it again, because Judge Tallman's question is very good. They replaced the revenue limits. They replaced the funding grants, and they said those receiving streams had to measure the progress. But nonetheless, with what they replaced them with, which was the base grant, the supplemental grants, the concentration grants, all these grants, nonetheless, after getting all of them in there and they get to give them, it doesn't matter what happens as it relates to this funding outside. The state's per-pupil funding derived has to be. No, Your Honor. Under the statutes, the revenue limit system was replaced with a base grant system, which allows the local educational entity, in this case the County Board of Education, to raise additional local revenue over and above what they get from the state. They could do that before.  Yes, they could. They could raise anything they wanted under the revenue limit system as long as after they got through raising it and the state would look at it and they'd say, here's the revenue limit system. You've at least got to have that much. If you didn't get it under the county, we're going to have to pay it. Well, that's not the case now. And that's exactly what's happening now. Under the base grant, they give them a base grant. They give them a supplemental grant. They give them a concentration grant. All of those are calculated in a way such that the prior funding mechanism remains the same. I disagree. Where in the statute does it show me that it doesn't remain the same? The statute, Section 2574, Article 2. Okay. I've got it. Changes it, changes the nomenclature from and explicitly says we are no longer having a revenue limit system. We now are switching this to a base grant. That doesn't answer the question again. Well, and then you look at. Just because you name a cat a dog doesn't mean it is a dog. The bottom line is, and this is a very fundamental question Judge Tallman asked, and I'm only following up so you make sure you understand. If, in fact, the state is still responsible for the limit that they say is a per-pupil funding limit, whether you call it revenue limits or base grants or supplemental grants or whatever, if they're responsible for that limit, you lose on funding. But the revenue limit system is no longer in place. I understand what Your Honor is saying, that if you just call it a different name, it's still the same thing if that's the way it operates in practice. But in practice and per the statutes, that's not the way it's operating now. The way it's operating now. Let me see if I can come at it from a different way. Is it still true that the state sets performance goals for students statewide? Proficiency, I think, is the term they use. Proficiency standards. They have, yes, like six or eight categories. And then the local county boards of education are supposed to come up with these plans, basically, to explain how in Orange County or in Modoc County we're going to meet those state proficiency goals. Isn't that how this system works under the United States? Basically, yes, with providing much more discretion to the local agency to decide which priorities. Not how you meet those goals, but you still have to meet them. Don't they still have standardized school tests that they administer to make sure that the children in the various grades are advancing to meet those proficiency levels? Yes. Does the state also provide or specify the textbooks that are to be used in teaching certain core courses like California history that I took when I was a seventh grader? I'm not sure. Okay. I think they do. Do they also set the certification standards for the teachers and how one becomes credentialed in the state? I'm not sure. I think the answer is yes. So I'm having a very difficult time understanding your opening statement that AB 97 amounted to a C change in the manner in which the state complies with its California constitutional duty to provide education to the children of the state. Well, on this second Mitchell factor, which relates to who was providing the education to the students. If absent, which I believe your opening statement was, absent a revenue stream from the state. See, I'm not from California, but my sense is that there has been a change in nomenclature. You're absolutely correct about that. There's been a change in process. There's been a change in statute. But essentially, you can't say that there's no funding such that there's no arm of the state in the county educational system because there is funding, there is grants. And what we really need to do is resolve whether or not the change takes us into the Mitchell factors and whether the Mitchell factors mandate a result that dictates the Orange County system here is not an arm of the state. Correct? I mean, legally, that's how we should approach it, right? I think so. I didn't hear the final part of your. All I'm trying to say is that we all ought to agree on the fact that notwithstanding the nomenclature, notwithstanding AB 97, notwithstanding the change and the reasons for it, money goes from the state as it's supposed to to county educational systems. That's undebatable. And the question then is whether or not in Mitchell, or in this case, Mitchell mandates that we follow the laws of Arizona or the Ninth Circuit cases in the other states that the school districts are not arms of the state. Yes. All right. Okay. And to come back to Your Honor's questions, there's been a fundamental shift from a revenue limit system to a base grant where the county board of education can raise funds over and above what they get from the state under the LCFF. It provides a minimum base, not a maximum. And that's right in the statutes and in practice. Let me ask you a question. You suggest that the OCDE gets 39% of its funding from local revenues. I read in both briefs trying to find out what those were. Do you know where they get this revenue? It's phrased as other local revenue. I understand. But do you know where they get it? They get it from local taxes, not from the state. Is that in your brief? Yes, repeatedly. Well, what you do say is that the OCDE misrepresents all funding coming from the state because their report said they get 39% of its funding from other local revenues. But what it didn't say is what those revenues are, those other local revenues. It's from their local tax revenues. Okay. That's your idea. Well, it's not just an idea. It's what's stated in the California Department of Education documents. Well, it says other local revenues, and I guess I'll ask them because they don't say what it is either. Let me ask you a second question. Isn't it true that the LCAPs must be developed using a state-provided template? Yes. Isn't it true that those same LCAPs must address eight specific areas of state-determined priorities? Yes, with great discretion as to which priorities they focus on. But they must address those eight specific areas, correct? Yes. And they must address these areas for all the students and for all the particular subgroups of students. Isn't that right in the statute, 52060C? The 52060C refers to school districts. 52066 is the LCAP for the boards of education. All right. But I'm just trying to make sure that what you're telling me, I saw these questions. Isn't it true that the LCAPs must address the implementation of the academic content and the performance standards adopted by the state board? Yes, with great discretion now at the local county level as to which priorities they emphasize and which priorities they don't. But my understanding was that the local school district prepares the draft plan and approves it, and then it goes to the county board of education that has to sign off on it, but then the county board of education sends it to the state for final approval. Isn't that true? I think there is some approval process by the state superintendent. That sounds to me to be a continuation of statewide control of education. It depends on who is doing the addressing. Who is the one that's deciding what the priorities are? That makes sense. I mean, suppose that you have a school district in maybe Los Angeles County that has a predominantly non-English speaking, non-English as a primary language base so that their big priority is going to have to be teaching English as a second language to the students so that they can survive in this society. And that might be a very different priority than a rural county in Northern California that has relatively few minority students. Well, I think Your Honor just identified one of the principal reasons that AB 97 was enacted. To give the districts a little more flexibility in terms of making sure that every student who advances from K through 12 basically meets minimal proficiency language skills in English, right? Well, that may be one aspect of it. But the county is the one. At the county level, they decide are we going to have a special program for disabilities, students with disabilities. I thought the state, one of those priority areas actually is compliance with English as a second language or developing English skills. I'm sure that's correct, Your Honor. But the question is who is it? Before it was the state providing this. Now it's the local entity determining are we going to prioritize this in the provision of education or that or what special program. Counsel, the reason I'm having a difficult time understanding your argument is that makes sense to me. That seems to me to be a more sensible way to address the problem given the vagaries of California's 58 counties and their differing demographics. I agree. But that's not the way it was before. But that doesn't answer the question as to whether or not the state has relinquished its control over basic education that must be provided to all the students in California. Prior to the implementation of AB 97, the state decided down to the ministerial portion, each priority, what each county was going to do. Now it's the county board of education that decides that. But the priority for Los Angeles County might be very different than the priority of Alpine County. Yes. Okay. You're down to two minutes and 50 seconds. Let me ask you one question, which I wanted to save to the end because it kind of goes in a different way. If Serrano 1 and Serrano 2, which are the California Supreme Court's interpretation of the Constitution, say that the state must spend an equal amount per student under the Constitution, are you arguing that AB 97 is unconstitutional? No. Well, if you didn't argue that, then how can I say that AB 97 is at all good? Because it seems to me AB 97 cannot overturn Serrano 1 or Serrano 2. AB 97 can't be enacted to overturn it. You've got to spend an equal amount per student under Serrano 1 and Serrano 2. And, therefore, if AP is constitutional, it's doing the same thing. First of all, Serrano did not lay down a law that all forevermore California's education system must be based on the revenue limit system. No. But it did say the state must spend an equal amount per student. That is constitutional California law. Your Honor, respectfully, it did not say that. What it said was the educational funding system before us is unconstitutional. Why? Because it didn't spend an equal amount per student. Then the Supreme Court came out and said, the way you're looking at this is wrong, California. And California came in again and said, we don't care what the Supreme Court says. The California Supreme Court says you must spend an equal amount per student, and we're holding to that. First of all, that's not what Serrano said. Serrano said equal opportunity, equal access to education. Secondly, it did not, it could not say forevermore we are going to have a fixed revenue limit system. The campaign for quality education case and many cases have come out and said the legislature is the one that has primary authority here. And this Court does not have the jurisdiction to say AB 97 is unconstitutional under the California Constitution. I agree with you, because if you just said that was your argument, I was going to say I don't have any authority to do it. Right. I was just running what your argument is. If AB 97 runs according to what I believe Serrano 1 and 2 say, then it seems to me that your argument is, again, not accessible. Serrano does not say that. It says equal access to educational opportunity. And that's an argument for a different case. That's almost the exact argument they made in this campaign for quality education case, is that, well, the Constitution provides standards. It provides equal access, equal amount per student. And the Court came back and said, no, we will not legislate from the bench. AB 90, well, it said that the legislature has total authority in this area. And until a court, a California court says this is unconstitutional and legislature go back to the books and come up with something that is, it's all a speculative hypothetical question whether AB 97. I stand to your answer and thank you for it. I don't mean to take any more of your time. Thank you. Thank you, counsel. Let's hear from the school board. Or excuse me, the Department of Education. Good morning, Your Honors. Jeffrey Thompson on behalf of the Orange County Department of Education. Here in California, we do have a very unique system of school district financing. It begins with Serrano 1 and Serrano 2 and Proposition 13. They require that the state provide equal funding per student. And they eliminate the district or the county offices of education to raise taxes. Only the state determines what portion of property taxes will be paid to school districts or county offices of education. And because of Proposition 13, no public school district, no public county office of education is able to go out and raise taxes to satisfy a judgment. So what is the meaning in the Department of Education, I think this is the state education, of other revenue sources? Your Honor, I didn't address it in the brief because it's not in the record on appeal. So I didn't think we could. But on the website, the county office does list that it receives other local revenue. Thirty-nine percent, I think, is the number. That revenue comes from things that it provides to other school districts. For example, special education services. The county provides deaf and hard of hearing services to other school districts. And those school districts would pay a portion of their funding, which comes from the state, to the county office of education to provide those services. The juvenile court system. The county office provides schools for those. It is still funding that originates with the state, but it's paid to another agency because they have students in their district, and they don't provide those services. I don't have that on the record on appeal, so I can't really introduce that. The way the system works then is that the bulk of the local revenue comes from whatever they can squeeze out of property taxes with the overarching lid of Proposition 13. Correct. And the state has to augment the difference. Not only that, but it is the state alone that determines what percentage of local property taxes will go to the schools versus the cities versus the county itself. The county office of education has no right to determine that. It's determined by the state. Okay. And it is those unique features that make California unique from Arizona, Alaska, in terms of what this court, the Ninth Circuit, determined was that in those states, the school districts in those states have the ability to raise local property taxes. Proposition 13 precludes that here. And when you couple that with Serrano versus Priest and the Buck versus State decision, in which the Supreme Court mandated that the state had to fund the school through the 188 days, plaintiffs have argued that the campaign case that he cited, the dissent opinion from the Supreme Court, somehow stands for the proposition that we don't have to provide a minimum level of school from the state. That is not correct at all. What that case said was it's up to the legislature, basically, to decide if there is a minimum level of funding. It's not for the court to determine. Or if there's a minimum quality of education is what it said. So if I understand, I'm just trying to put this in perspective. And now the state gives everyone the base grant. The state gives everyone the supplemental grants that qualify. The state gives them the concentration grants that qualify. The base amount is calculated according to the statutory amount multiplied by the number of students. And then the state also determines how much property tax goes to each individual school district. Correct. So in that way, how is that similar to or is it different from, which is, I understand, counsel's argument, which prior was the state gives these revenue limits and funding grants, and then they look at the property taxes or the individual county property taxes, and if there isn't enough to meet their per-pupil funding, they fund more or they don't. Tell me how that is equal. It is the same because they do the same thing now. If they look at the amount of property taxes are deducted from what you would get from the state in the base grant, the supplemental grant, and the concentration grant. So if you live in a poor rural county that does not have sufficient property taxes, for example, the state is going to supplement that. If you were, and I'm picking this up. Oh, in other words, it is the same formula as was used in the revenue limits and the funding grants, just with different names. Different names, and your honors are correct, as is plaintiff's counsel, is there is more leeway at the local level to what I would call move money around to fill a certain bucket. They used to have these very limited grants that you would get that you could only use this money, say, for early morning breakfast program, or you could only use this money for English second language, or only use this money for some other limited purpose. The state has given the local district the ability to say, okay, we have many English second language students and we need to focus on that in order to get them up to speed so that they can pass the state-mandated tests, so that they can succeed going forward. It has that autonomy to move the money around a little bit more, subject, as the court pointed out, to the state control of ultimately. Are those the only things that changed? I mean, it seems to me that if everything's the same, the governor and the legislature went through an awful lot of trouble and expense not to do much for children in the state of California. I think the big difference is there is more flexibility at the local level to change the money around. Based on meeting the district's goals for student achievement and covering the eight areas dictated by the state. Correct. So if you have a, for example, if your big problem is that you do not have sufficient, you know, students who are sufficiently versed in English, they're giving them more money and the ability to focus in that area as opposed to, excuse me, math or something else like that, where you're doing okay. So there were significant legal changes that effectuate different and presumably better treatment of students, but the legal issue that we have to decide is whether or not those changes impact whether or not your client functions as a state actor, an arm of the state, or entirely autonomous, right? Correct. And then what's your answer to that? It is an arm of the state, as basically held by the butt court, by Serrano 1 and 2. The funding it derives is from the state, and because the state mandates a minimum level of education, in the event that my client was hit with, say, a Are we able to decide that without, I mean, do we have to do a specific analysis of these Mitchell factors? Because Mitchell, as I understand it, was the springboard in Nevada, Arizona, and Alaska to come to contrary rulings for what you want from us. You do because those rulings, and again, the big difference between Nevada, Alaska, and Arizona, is that the local school district could raise taxes. Proposition 13 precludes that from happening in California. They also don't have a Serrano, similar decisions in those states. Correct. They don't have that. But as I look at Mitchell factor number one is, who's going to have to satisfy a judgment? And in this case, because the state mandates that we have at least 180 days of school for everywhere, and the standards, the state under Serrano one and two, and buts, is going to be required to satisfy any judgment if a school district can't. So if I were to ask you what is the effect of 42238J, what would you tell me its effect is? Isn't that the central issue of whether you are performing central government functions without state control? Yes, but I would say that the effect of it is not significant because the funding is still coming from the state, and the state is still mandating the standards. Well, I didn't find your explanation of the effect of section 4238J in your briefing, and so that's why I'm asking you directly the question, because your opposition is suggesting that 4238J really makes the entity, the performing of the central government functions, and therefore is not anymore a state arm. And I would disagree in the fact that the state still mandates all of the standards. The state still provides the funding. So the effect is? Nothing. Negligible. Well, and I'm going to argue with you a little bit. It seems to me it's at least that you now get to include local priorities. It seems to me that at least says that even though you have to set the goals for the students and the specific subgroups of students, and you must cover your eight areas, you in general choose the ones you're going to cover. It gives them more flexibility. And so, therefore, there is some effect. What we're really putting our pencil to the paper about is, does the system now allow the school district to be the central government function, or does it just allow them to mess around with stuff underneath the state umbrella? That's what we're really trying to determine, isn't it? It is. And I think, as the questions from the court have indicated, it is clear that the state still controls the system, and it does allow them some flexibility to meet goals where they think they have specific needs, subject to county approval and then subject to state approval. Because if I take the rest of the factors, the Mitchell factors, it seems to me that you lose on the other three. And I know we have all kinds of law that suggests I give less weight to whether you can sue or be sued, give less weight to whether you can hold property. The agents of the state, what's your best argument that you're agents of the state? The Butts case, which says that county offices are agents of the state for purposes of enacting the constitutional obligations. I think also that the state sets all the standards by which we operate. I would also argue that we hold property in our name, but it is for the benefit of the state, is what the case law says. Is there any question that if a student fell down and hurt himself badly because of imperfections in a parking lot on a school district-owned property and got a judgment for a personal injury that state funds would be used to pay the judgment? No. I mean, the funds would come from the district's base grant, which comes from the state. And the real issue is there's also a whole line of California education code where in the event that a district falls below certain reserve levels, the state steps in and takes over the district at varying degrees. That was true prior to AB-97, and it's true now, right? It is, correct. I've unfortunately had the privilege of working for some state-controlled school districts in my time, so I know that happens. That doesn't happen in Arizona and Alaska and Nevada, though, does it? No, because they have the ability to raise revenue, and at least in the Alaska case, they said that there's no obligation to pay, for the state to pay beyond a certain level. Counsel, let me ask you a question, and I'll just keep using my ESL hypothetical as an example. In light of AB-97, instead of a block grant for that specific program, prior to AB-97, was the school, either Board of Education or district, forbidden from using money that had been allocated for ESL to cover a shortfall in a different priority area? Correct. The law was before they had approximately 50 what they call categorical funded categories, and as I said earlier, if you had categorical funds for ESL but you got sued or you wanted to do a lunch program for your kids and you didn't have enough money for the lunch program, you couldn't move the money from ESL over to the lunch program. It's limited to that program only. But now in determining how the local district is going to meet its goals, it can decide we don't need to allocate as much of our block money to ESL because the need is not as great in our district. We can spend it on other priority areas. Correct. They have the ability to move it to where their needs are, provided they're meeting all of the minimum requirements. No, I understand. But if you only have a handful of students who need special tutoring or whatever, maybe a special class because of the demographics of your district, you can move money over to what is a more pressing need. Correct. Okay. That is the way I read the law. That's how I read the law as well. Unless the panel has anything further or you want to… I just conclude with the simple statement that I think AB 97 is really simply a change in nomenclature and allowing the districts a little more flexibility to meet the state obligations. I don't think it changes Serrano 1, Serrano 2, or Proposition 13. I think unlike the other three states in which the Ninth Circuit has found no 1983 Amendment immunity, there are no Eleventh Amendment immunity. There is no ability for these districts to raise money apart from it. And I think the law remains the same. Thank you. Thank you, Counsel. Counsel, you've got about a minute and 11 seconds. Did we burn it? All right. I'll give you a couple of minutes and rebuttal, Mr. Ames. Thank you, Your Honor. Counsel, for OCDE, has provided no citation to where they can say all money still continues to come from the state. The California Department of Education… That's never been the case, has it? In effect, yes. Under the revenue limit system, the money comes in to the local county, and then the county pays the state. But even under the system prior to AB 97, it was a combination of state money plus money raised locally, was it not? Yes. But that local money went to the state and… And then came back? And came back as a revenue limit. Now that has been completely changed under AB 97. Now it's a minimum base grant comprised of a number of aspects. But they come up with a minimum base grant, and then the county can raise more money locally. And that's exactly what's happened here. With 39 percent of their funding coming from other local revenues over and above the property tax revenues that went back to the state to comprise the LCFF. And furthermore, the issue is who has the legal liability and or whether the funds are necessarily replaced with state funds under the Ninth Circuit arm of the state test. And here there has been, after AB 97, no aspect of this that shows that the money would not come from the local revenue. In Alaska, 98 percent of the money came from the state. Yet this court found that it was still more of a local entity, and Eleventh Amendment immunity did not apply. Alaska has a very different system, do they not? They have essentially what amounts to home rule. And in that particular case that I think you're referring to, the school district was actually a function of the municipal government for the native village that was at issue in that case. I certainly don't pretend to know the details of Alaska. They don't have counties, they have boroughs, but the boroughs don't cover the whole state. It's a very different system than what we're used to in the lower 48. But you have Easton in Nevada, Savage in Arizona, and all over the country. But they don't have Prop 13 and they don't have Serrano. And so they can raise local property taxes at will beyond 1 percent. And what, for example, I quoted a number of cases, one of which said, Sonoma County case, which said, yes, Prop 13 certainly caps the amount of local property taxes. But it's up to the legislature to decide how those local property taxes is used. They can switch it between the schools and the counties and back and forth. And that's exactly what the legislature did here with AB 97. Okay. I think we have your argument in hand. Thank you very much. Thank you very much. The case just argued is submitted. We'll get you a decision as soon as we can.
judges: Tallman, N.R. Smith, Murphy